Thiago M. Coelho (SBN 324715)
*ThiagoCoelhosTeam@wilshirelawfirm.com*
Brian J. Ellsworth (SBN 326756)
*brian.ellsworth@wilshirelawfirm.com*
Chumahan Bowen (SBN 268136)
*chumahan.bowen@wilshirelawfirm.com*
Michael C. Forrest (SBN 303414)
*michael.forrest@wilshirelawfirm.com*
**WILSHIRE LAW FIRM, PLC**
660 S. Figueroa St., Sky Lobby
Los Angeles, California 90017
Telephone: (213) 381-9988
Facsimile: (213) 381-9989

*Attorneys for Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

CAROLINE GEZALYAN, VICTORIA GALE ROBERTSON, KRISTA M. ZIZZO, and EMERSON MELO, individually and on behalf of all others similarly situated,

*Plaintiffs,*

v.

WILLIAMS-SONOMA, INC., a Delaware corporation; and WILLIAMS-SONOMA STORES, INC., a California corporation,

*Defendants.*

Case No.: ___________________

**CLASS ACTION COMPLAINT FOR:**

1. Violation of California's False Advertising Law (Bus. & Prof. Code §§ 17500 et seq.)
2. Violation of California's Unfair Competition Law (Bus. & Prof. Code §§ 17200 et seq.)
3. Violation of the Consumers Legal Remedies Act (Civ. Code §§ 1750 et seq.) (injunctive relief only)
4. Intentional Misrepresentation and Fraudulent Concealment
5. Negligent Misrepresentation

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

Plaintiffs Caroline Gezalyan ("Gezalyan"), Victoria Gale Robertson ("Robertson"), Krista M. Zizzo ("Zizzo"), and Emerson Melo ("Melo") (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants Williams-Sonoma, Inc. and Williams-Sonoma Stores, Inc. (together, "Defendants"). Each Plaintiff's allegations about that Plaintiff's residence, domicile, citizenship, and own experience are based on personal knowledge. All other allegations are based on information and belief, including counsel's investigation and the sources identified below.

## NATURE OF THE ACTION

1. Pottery Barn and West Elm sell home furnishings by telling customers they are getting a deal. On their websites, in their stores, and in a steady stream of promotional emails, Defendants display a higher price, crossed out and presented as the item's regular price (an "Advertised Regular Price"), and put a lower "Sale," "Clearance," or "Limited Time Offer" price beside it. The difference is advertised as money saved, and the shopper is told to act before the savings disappear. But, upon information and belief, the Advertised Regular Price is not a price Defendants actually charge. Numerous products carry the same crossed-out price and the same discounted price month after month. The "sale" price is simply the price; the Advertised Regular Price is a number kept on the page to make the ordinary price look like a bargain. Defendants could simply tell their customers what the merchandise costs, so that customers could compare that price with what other sellers charge and decide whether it is worth it. Upon information and belief, Defendants do not, because the merchandise sells better when its ordinary price is dressed up as a discount. If Defendants could sell these furnishings at these prices by advertising them truthfully, they would have no need for the comparison. California law does not permit this. A retailer may advertise a former price only if that price actually prevailed in the market during the three months before the advertisement, or if the advertisement clearly states when it did. A retailer may not invent a regular price and sell against it.

2. Plaintiff Caroline Gezalyan's purchases show how it works. On July 7, 2026, she bought an Asymmetrical Face Object on potterybarn.com for $58.99. The product page said "Sale," showed a crossed-out Advertised Regular Price of $99.50, and told her she was saving $40.51, about 41 percent. She was not. Pottery Barn had advertised the same object for the same $58.99 against

the same $99.50 on April 20 and again on June 13, 2026, 78 and 24 days before she bought. The "sale" did not end after she bought, either: on November 2, 2026, the object was listed at "Clearance $38.97," still against $99.50. On September 20, 2026, Gezalyan bought a Bronze Sculpted Objects set from the same website for $58.97, marked "Clearance" against a crossed-out $149, a represented saving of $90.03, or about 60 percent. But Pottery Barn had advertised that set for $103.99 against $149 in November 2025, March 2026, and April 2026, and it was still "Clearance $58.97" against $149 nine days after her purchase. Not one dated record Plaintiffs have located shows either item offered at its crossed-out price.

3. Plaintiff Victoria Gale Robertson had the same experience with Pottery Barn Kids and Pottery Barn Teen. On January 8, 2026, she bought an Ava Ribbon Art Cable on potterybarnkids.com for $34.99, advertised as a sale price against a $59 Advertised Regular Price. Pottery Barn Kids had advertised the cable for the same $34.99 against the same $59 on November 11, 2025, 58 days earlier; it advertised the same comparison again on March 9 and October 12, 2026; and on November 2, 2026, nearly a year after her purchase, the cable was still "Sale $34.99" against $59. On August 29, 2026, after receiving a Pottery Barn Teen email promoting an "Up to 50% Off Sale," Robertson bought two LoveShackFancy Tall Plug-In Rolling Carts for $129.99 each, advertised against a $229 Advertised Regular Price. Upon information and belief, $229 was not a price Pottery Barn Teen was charging. Upon information and belief, the cart had been offered for $157 on June 8, 2026, within the three months before her purchase, and on November 2, 2026, it was still advertised "on sale" against the same $229.

4. Plaintiff Krista M. Zizzo's purchase shows that the "limited time" is not limited. On November 1, 2024, she bought an Aubrey 112-inch Corner Desk with File Cabinets in Dutch White from Pottery Barn for $1,707. The offer was labeled "Limited Time Offer" and displayed a crossed-out Advertised Regular Price of $1,897, a represented saving of $190. More than nine months later, on August 10, 2025, Pottery Barn was offering the same desk for the same $1,707 against the same $1,897, still labeled "Limited Time Offer." The desk then showed a second feature of Defendants' practice: the crossed-out price went up while the selling price did not. On January 22, 2026, the desk was $1,797 against $1,997, an apparent $200 saving; on June 18, 2026, it was still $1,797, but now

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

against $2,097, an apparent $300 saving. On October 8 and November 2, 2026, about two years after Zizzo's purchase, the desk remained a "Limited Time Offer" at $1,887 against $2,097. In none of the dated records Plaintiffs have located, spanning two years, has Pottery Barn offered this desk at its crossed-out price.

5. Plaintiff Emerson Melo's West Elm purchase shows that the practice extends across Defendants' brands. On August 16, 2025, he bought a Crinkle Velvet Full/Queen Duvet in Pearl Gray on westelm.com for $54.97. The product page displayed a crossed-out Advertised Regular Price of $189 beside the $54.97 sale price, a represented saving of $134.03, or about 71 percent, and that markdown is what led him to buy. He thought he was getting a higher-quality item at a deep discount; had he known $54.97 was simply the price, he would not have bought it. A published sale report had identified the same duvet at $54.97 against $189 on June 24, 2025, 53 days earlier, and on October 30 and November 2, 2026, more than fourteen months after his purchase, West Elm still listed it at $54.97 against $189.

6. These are not isolated examples. Dated advertisements for Pottery Barn blankets, counter stools, quilts, and shams show the same lower prices advertised against the same Advertised Regular Prices for months at a time, under the same "Limited Time Offer" label, in some cases from March 2026 through October 2026. Upon information and belief, Defendants generate these comparisons through common merchandising and pricing systems applied across the Pottery Barn, Pottery Barn Kids, Pottery Barn Teen, and West Elm brands, and their practice is to pair a high Advertised Regular Price with a lower selling price and keep that pairing in place for months or years, relabeling it "Sale," "Clearance," or "Limited Time Offer" and, as with the Aubrey desk, raising the crossed-out price to enlarge the apparent savings, while the price the shopper pays barely moves.

7. This is what California law forbids. Business and Professions Code section 17501 provides that no price may be advertised as a former price unless it was the prevailing market price within the three months immediately preceding the advertisement, or the advertisement clearly, exactly, and conspicuously states when that price did prevail. Civil Code section 1770(a)(13) prohibits false or misleading statements about the existence or amount of a price reduction. The

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

Federal Trade Commission's Guides Against Deceptive Pricing likewise explain that a former price must be the actual, bona fide price at which the item was offered to the public on a regular basis for a reasonably substantial period, not an artificial, inflated figure established so that a later "reduction" can be advertised. Upon information and belief, the Advertised Regular Prices Plaintiffs saw were not prevailing prices during the three months before they bought; Defendants did not disclose when, if ever, those prices had prevailed; and the advertised savings and "limited time" offers were therefore false.

8. The false comparison matters because a shopper cannot reconstruct a product's pricing history and, for Defendants' proprietary designs, cannot check the price anywhere else. The shopper relies on the retailer's Advertised Regular Price as the measure of value and of the deal. A shopper who is told the real price can compare it with what other sellers charge and decide whether the item is worth it. A shopper who is told she is saving $90 or $190 has no reason to look further. The crossed-out price takes away the information she needs to comparison shop and replaces it with a reason to stop. Marketing research confirms what common sense suggests: an advertised reference price can increase perceived value and purchase intentions while reducing the incentive to search for a lower price, and a deadline supplies a reason to buy before checking.[1] Plaintiffs did exactly that. They believed they were getting furnishings that ordinarily cost more, and that belief persuaded them to buy when they did. Had they known the Advertised Regular Prices were not real, they would have kept shopping, would not have bought on those terms, or would have paid less.

9. Plaintiffs bring this action on behalf of a Nationwide Class and a California Subclass under the False Advertising Law ("FAL"), the Unfair Competition Law ("UCL"), the Consumers Legal Remedies Act ("CLRA"), and California common law. They seek restitution and damages. Each of them would shop at the Covered Brands again, but none can tell whether an advertised sale

---

[1] Dhruv Grewal, Kent B. Monroe & R. Krishnan, The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions, 62 J. Marketing 46, 56 (Apr. 1998), https://www.dhruvgrewal.com/wp-content/uploads/2014/09/1998-JM-Value.pdf (last visited Nov. 5, 2026); Federal Trade Commission, Bringing Dark Patterns to Light 4, 22 (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%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%20-%20FINAL.pdf (last visited Nov. 5, 2026).

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

is real, so they also seek a public injunction requiring Defendants to do what the law already requires: advertise a former price only if it is genuine, and say when it last prevailed if it is not. The CLRA claim seeks injunctive relief at this stage.

**THE PARTIES**

10. Plaintiff Caroline Gezalyan is a natural person domiciled in Van Nuys, Los Angeles County, California, and is a citizen of California. She bought the Face Object and the Bronze Set through potterybarn.com, for personal, family, or household use.

11. Plaintiff Victoria Gale Robertson is a natural person residing in Los Angeles County, California, domiciled in California, and a citizen of California. She purchased the Ava Ribbon Art Cable and LoveShackFancy rolling carts described below for personal, family, or household use.

12. Plaintiff Krista M. Zizzo is a natural person residing and domiciled in Carlsbad, San Diego County, California, and is a citizen of California. She purchased the Aubrey 112-inch Corner Desk with File Cabinets in Dutch White for personal, family, or household use. She selected and purchased the desk using her husband's name and credit card; the order therefore identifies Steve Zizzo as the recipient.

13. Plaintiff Emerson Melo is a natural person residing and domiciled in Los Angeles, Los Angeles County, California, and is a citizen of California. He purchased a Crinkle Velvet Full/Queen Duvet in Pearl Gray through westelm.com for personal, family, or household use.

14. Defendant Williams-Sonoma, Inc. is a Delaware corporation with its principal place of business at 3250 Van Ness Avenue, San Francisco, California 94109. It is a citizen of Delaware and California. Its brands include Pottery Barn, Pottery Barn Kids, Pottery Barn Teen, and West Elm. It operates potterybarn.com. On information and belief, Williams-Sonoma, Inc. directs the challenged selling prices, advertised regular prices, and promotional messaging across these brands from its San Francisco headquarters.

15. Williams-Sonoma, Inc. identifies itself in West Elm's website terms as the company referred to by "westelm.com," "West Elm," "We," and "Us." Those terms identify its headquarters at 3250 Van Ness Avenue in San Francisco. West Elm therefore is not an unrelated retailer whose advertisements are attributed to Defendants solely by association; it is a Williams-Sonoma brand and

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

website through which Williams-Sonoma markets and sells the household goods at issue.[2]

16. Defendant Williams-Sonoma Stores, Inc. is a California corporation and a wholly owned subsidiary of Williams-Sonoma, Inc. On information and belief, its principal place of business is also at 3250 Van Ness Avenue, San Francisco, California. It is a citizen of California. On information and belief, it operates Pottery Barn retail stores, including stores in California, and acts as a seller of Pottery Barn merchandise, including merchandise ordered through potterybarn.com.[3]

17. On information and belief, each Defendant acted as the agent of the other with respect to the conduct alleged here, and each is liable for its own participation in the challenged pricing, advertising, and sales. "Pottery Barn brands" means Pottery Barn, Pottery Barn Kids, and Pottery Barn Teen. The Pottery Barn brands and West Elm together are the "Covered Brands." The challenged sales channels include their retail stores, potterybarn.com, potterybarnkids.com, pbteen.com, and westelm.com. References to a particular brand identify the channel through which Defendants advertised or sold the merchandise; references to "Defendants" concern their participation in the common practices alleged here. On information and belief, Defendants control those practices across the Covered Brands.

## JURISDICTION

18. This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). On information and belief, the proposed Nationwide Class exceeds 100 members and includes citizens of states other than California and Delaware, satisfying minimal diversity because Williams-Sonoma, Inc. is a citizen of California and Delaware. The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, under section 1332(d)(6). That allegation rests on the four-year Class Period, Pottery Barn's approximately $3 billion in annual net revenue, the repeated pricing practices alleged here, and the aggregate restitution, compensatory damages,

---

2 West Elm, Terms and Conditions, "Who We Are" (updated Oct. 9, 2026; last visited Nov. 2, 2026), https://www.westelm.com/m/customer-service/terms.html?cm_re=GlobalLinks-_-Footer-_-TermsConditions.

3 Williams-Sonoma, Inc., Form 10-K for the fiscal year ended Feb. 1, 2026, Exhibit 21.1 (Subsidiaries of the Registrant) (listing Williams-Sonoma Stores, Inc., a California corporation), https://www.sec.gov/Archives/edgar/data/719955/000071995526000059/0000719955-26-000059-index.htm (last visited Nov. 5, 2026).

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

punitive damages, and recoverable attorneys' fees sought.

19. Defendants operate a nationwide retail and e-commerce business and advertise the challenged merchandise to consumers throughout the United States. The proposed Classes concern nationwide purchases and injuries arising from that conduct and are not confined to California citizens or California transactions.

20. This Court has personal jurisdiction over Defendants. Williams-Sonoma, Inc. maintains its principal place of business in San Francisco, California, and Williams-Sonoma Stores, Inc. is incorporated in California and, on information and belief, maintains its principal place of business here. Both are at home in this State.

**VENUE**

21. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). Both Defendants reside in this District for venue purposes: Williams-Sonoma, Inc. maintains its principal place of business in San Francisco, and Williams-Sonoma Stores, Inc., on information and belief, also maintains its principal place of business here. A substantial part of the events giving rise to these claims occurred here. On information and belief, Defendants made the challenged pricing and advertising decisions at their San Francisco headquarters and disseminated those representations from this District.

22. Venue for the CLRA claim is proper under Civil Code section 1780(d) because Williams-Sonoma, Inc. has its principal place of business and does business in San Francisco County. Plaintiffs submit the declaration required by section 1780(d) concurrently with this complaint.

**DIVISIONAL ASSIGNMENT**

23. Divisional assignment is proper in the San Francisco or Oakland Division under Civil Local Rule 3-2(c) and (d), because this action arises in San Francisco County, where Defendants are headquartered and, on information and belief, made the challenged pricing and advertising decisions.

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

## FACTUAL ALLEGATIONS

**A. Defendants control the prices and sale claims across the Covered Brands**

24. Defendants sell furniture, bedding, lighting, rugs, and home décor through the Covered Brands' websites, catalogs, and stores. Williams-Sonoma's fiscal 2025 annual report identifies Pottery Barn as a brand within its business and reports approximately $3 billion in Pottery Barn net revenue alone.[4]

25. Defendants decide what shoppers will pay and what bargain they will be told they are receiving. They choose the selling price, the higher regular price, the "Sale," "Clearance," or "Limited Time Offer" label, and the messages urging shoppers to act. On information and belief, their centralized pricing and promotion systems retain those decisions and the resulting sales. Shoppers see the comparison, but not the history behind it. The challenged advertisements do not say when the crossed-out price last prevailed or how long the lower price has been offered.

26. A crossed-out regular or former price beside a lower selling price tells shoppers how much they are supposedly saving. "Sale," "Clearance," and "Limited Time Offer" labels reinforce that comparison. Messages such as "Don't miss out" and "Get it before it's gone" add pressure to buy promptly. Plaintiffs challenge the overall impression of a genuine bargain, including the claimed amount of savings and, where represented, the limited duration of the offer.

**<u>B. Why fake discounts and false urgency work</u>**

27. A shopper evaluating a piece of furniture or a decorative object usually cannot reconstruct its pricing history. Defendants possess that history and supply the purported regular price at the very moment the shopper is deciding whether to buy. The shopper is asked to evaluate the lower price against a benchmark selected by the seller, without being told that the lower price has repeatedly been available or that the benchmark is stale or inflated.

28. That higher number acts as an anchor. It raises the shopper's starting point for judging the merchandise and makes the lower price appear more attractive by comparison. Researchers

---

[4] Williams-Sonoma, Inc., Form 10-K for the fiscal year ended Feb. 1, 2026, segment net revenues (reporting Pottery Barn fiscal 2025 net revenues of $2,999,332,000), https://www.sec.gov/Archives/edgar/data/719955/000071995526000059/wsm-20260201.htm (last visited Nov. 5, 2026).

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

studying comparative-price advertising found that inflated advertised reference prices can increase perceived value and purchase intentions while reducing the likelihood that shoppers will search for a lower price. An inflated regular price therefore can influence both whether a consumer buys and whether she keeps looking elsewhere.[5]

29. The effect is not limited to what consumers say they intend to do. In a controlled catalog field experiment, researchers held prices constant and changed which products carried a sale designation. The sale labels increased actual orders for the selected products. That finding illustrates why a retailer has an incentive to call an ordinary price a sale: the representation itself can change purchasing behavior, even when the amount charged does not change.[6]

30. The represented saving supplies a benefit separate from the merchandise itself: the belief that the shopper has obtained a particularly good deal. Research also shows that price can serve as a cue to perceived quality. A shopper considering a $300 table may instead pay $500 for a table advertised as regularly costing $1,200, believing the extra $200 buys a substantial upgrade. If $500 is the seller's ordinary price, the crossed-out figure supplies a false reason to make that trade-up. The product has not changed; the comparison has changed what the consumer believes she is getting for her money.[7]

31. A supposedly temporary offer adds a reason not to wait. "Don't miss out," "Hours left," and "Last call" tell shoppers that delay may cost them the advertised savings. The Federal

---

[5] Dhruv Grewal, Kent B. Monroe & R. Krishnan, The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions, 62 J. Marketing 46, 56 (Apr. 1998), https://www.dhruvgrewal.com/wp-content/uploads/2014/09/1998-JM-Value.pdf (last visited Nov. 5, 2026); Joel E. Urbany, William O. Bearden & Dan C. Weilbaker, The Effect of Plausible and Exaggerated Reference Prices on Consumer Perceptions and Price Search, 15 J. Consumer Research 95 (1988), https://doi.org/10.1086/209148 (last visited Nov. 5, 2026).

[6] Eric T. Anderson & Duncan I. Simester, Are Sale Signs Less Effective When More Products Have Them?, 20 Marketing Science 121, 129–30 & tbl. 3 (2001), https://www.kellogg.northwestern.edu/faculty/anderson_e/htm/personalpage_files/Papers/Are_Sale_Signs_Less_Effective_When_More_Products_Have_Them.pdf (last visited Nov. 5, 2026) (catalog field experiment holding prices constant and measuring orders for selected sale-designated products).

[7] Akshay R. Rao & Kent B. Monroe, The Effect of Price, Brand Name, and Store Name on Buyers' Perceptions of Product Quality: An Integrative Review, 26 J. Marketing Research 351–57 (1989), https://doi.org/10.1177/002224378902600309 (reviewing price as a cue to perceived quality).

Trade Commission identifies false discounts and false limited-time messages as tactics that create pressure to buy immediately. When a recurring price is presented as an expiring opportunity, the retailer gives consumers a false reason to decide before comparing alternatives or reconsidering whether they want to spend the money.[8]

32. The objection that consumers can simply compare prices overlooks what Defendants represent and how the offer works. A shopper may be skeptical of sales in general without knowing whether this item's stated regular price is genuine. Comparing today's prices on other websites does not reveal the seller's own recent price history, particularly for merchandise sold under its own brands. Furniture comparisons are further complicated by differences in design, materials, dimensions, and configuration. A different retailer's table or desk is not necessarily an interchangeable product, making the seller's claimed regular price an especially important benchmark. And the inflated benchmark operates before the shopper decides whether to keep searching: it makes the offer look attractive, while the apparent deadline supplies a reason to stop looking and buy. Defendants hold the historical information needed to test the representation, but consumers must decide using the information Defendants choose to display.[9]

33. Williams-Sonoma itself recognizes the competitive significance of that differentiation. Its 2026 proxy statement explains: "Given our strong value equation and proprietary products that cannot be found elsewhere, we have pricing power that others do not." That proprietary merchandise makes a simple comparison to an identical item at another retailer unavailable for those products. It does not give Defendants license to invent the historical prices used to advertise savings.[10]

34. For the retailer, the incentive is straightforward. A fictitious comparison can create the appearance of a substantial discount without requiring a corresponding reduction from the price the

[8] Federal Trade Commission, Bringing Dark Patterns to Light, Staff Report 4, 22 (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%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%20-%20FINAL.pdf (last visited Nov. 5, 2026).

[9] Grewal, Monroe & Krishnan, supra, at 56 (reference-price effects on perceived value, purchase intentions, and price search).

[10] Williams-Sonoma, Inc., 2026 Proxy Statement 33, https://www.sec.gov/Archives/edgar/data/719955/000071995526000109/wsm-20260506.htm (last visited Nov. 5, 2026).

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

retailer ordinarily charges. The retailer gains the persuasive force of a bargain while preserving the revenue associated with its ordinary price. Upon information and belief, that is why Defendants repeatedly pair the challenged selling prices with inflated or stale benchmarks and messages urging consumers to act.[11]

35. Plaintiffs' experiences show why these representations matter. Each believed the crossed-out prices were genuine and used the represented savings to assess the offers. The comparisons increased the apparent attractiveness of the products and induced their purchases. Had Defendants accurately disclosed the recent pricing and actual savings, Plaintiffs would not have bought the items or would have paid less.

**C. California law prohibits misleading price comparisons**

36. Marketing research shows that displaying a higher comparison price can make an offer seem more valuable and increase consumers' willingness to buy. Larger advertised discounts can increase perceived value and willingness to buy while reducing consumers' stated intention to search for a lower price. A fictitious comparison price can therefore make an ordinary price appear to be a bargain.[12]

37. General skepticism does not necessarily prevent that response. In a study of comparative-price advertising, exaggerated reference prices generally produced the same favorable perception effects as plausible reference prices, even among more skeptical subjects. In the study's simulated shopping task, when the advertised sale price exceeded the lowest price consumers expected to find, an exaggerated reference price increased the proportion buying from the advertiser without checking another store. The premise that every shopper will neutralize a false bargain by independently researching it disregards the possibility that the bargain claim itself discourages that further search.[13]

[11] 16 C.F.R. § 233.1(a), (c) (explaining fictitious former-price comparisons and the return to an ordinary selling price advertised as a bargain).
[12] Dhruv Grewal & Larry D. Compeau, Comparative Price Advertising: Informative or Deceptive?, 11 J. Pub. Pol'y & Mktg. 52, 55–56 (1992).
[13] Joel E. Urbany, William O. Bearden & Dan C. Weilbaker, The Effect of Plausible and Exaggerated Reference Prices on Consumer Perceptions and Price Search, 15 J. Consumer Research



WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

38. The CLRA prohibits "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions." Cal. Civ. Code § 1770(a)(13).[14] A retailer violates this provision when it overstates the amount of a discount, even if the selling price has in fact been reduced from some earlier figure.

39. The FAL specifically regulates former-price advertising: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price . . . within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code § 17501. The statute therefore gives an advertiser two choices: compare only to a former price that actually prevailed within the preceding three months, or tell the shopper the date on which the former price last prevailed. Defendants do neither. California's implementing regulation confirms that a "former price" includes any comparison expressed as "formerly," "regularly," "originally," "reduced from," "was ___ now ___," or "___% off." For merchandise sold exclusively by a retailer, its own bona fide offers and sales may establish the prevailing market price upon an adequate factual showing. As alleged below, the challenged decorative objects are, on information and belief, Pottery Barn's own exclusive designs. Their product-specific offers and sales therefore provide evidence of the relevant prevailing prices.[15]

40. The FTC's Guides Against Deceptive Pricing say the same thing. A former price is a legitimate basis for comparison only if it is "the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time." If the former price is "fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the 'bargain' being advertised is a false one." Using a price that "was not used in the recent past but at some remote period in the past, without making disclosure of that fact" is deceptive, and these rules apply whether or not the former price is

---

95–110 (1988), https://doi.org/10.1086/209148 (last visited Nov. 5, 2026) (publisher abstract describing effects among more skeptical subjects and a computer-simulated shopping experiment).

[14] Cal. Civ. Code § 1770(a)(13)

[15] Cal. Bus. & Prof. Code § 17501; 4 Cal. Code Regs., § 1301 (defining "former price" for purposes of Business and Professions Code section 17501),



WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

accompanied by words such as "Regularly" or "Formerly." 16 C.F.R. § 233.1(a), (d), (e).[16]

41. These protections target the false bargain, not merely a mistake in the amount charged. The Legislature expressly directed that the CLRA be liberally construed to protect consumers against unfair and deceptive business practices and provide efficient and economical means of securing that protection. Defendants' price comparisons deprived Plaintiffs of truthful information about the savings offered and induced them to spend money on that false premise. The protections also serve fair competition: a retailer that truthfully states its ordinary prices should not lose business to a competitor that invents a bargain by inflating the comparison price.[17][18]

42. The resulting injury is economic. Consumers spend money because of a bargain that was not real, or agree to pay more than they would have paid with truthful information. Receiving a usable product does not restore the choice lost through the deception. A consumer induced to purchase by a false price comparison can suffer economic injury even though she received the product and paid the amount shown at checkout.

**D. Plaintiffs' purchases and the representations they encountered**

***Gezalyan's Face Object***

43. Pottery Barn sold Gezalyan one Asymmetrical Face Object, White, for $58.99 on July 7, 2026, through potterybarn.com.

44. Before she bought it, the Face Object's product page displayed the label "Sale," a selling price of $58.99, and a crossed-out Advertised Regular Price of $99.50. That presentation told her that the Face Object normally sold for $99.50 and that she was saving $40.51, about 41 percent, for a limited time.

45. Gezalyan believed that $99.50 was Pottery Barn's genuine recent regular price for the

---

[16] Federal Trade Commission, Guides Against Deceptive Pricing, 16 C.F.R. § 233.1(a), (d), (e).
[17] Cal. Civ. Code §§ 1760, 1770(a)(13), https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=CIV&sectionNum=1760.
[18] Federal Trade Commission, Annual Report 17 (1967), https://www.ftc.gov/sites/default/files/documents/reports_annual/annual-report-1967/ar1967_0.pdf (describing injury to misled consumers and diversion of trade from reputable sellers, including nonexistent bargains in household furnishings).

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

Face Object and that the $58.99 "Sale" price represented a temporary reduction from it. She relied on that product-page comparison in deciding to purchase when she did.

46. Pottery Barn had already advertised the Face Object for $58.99 against $99.50 on April 20 and June 13, 2026, 78 and 24 days before Gezalyan's July 7 purchase. Each earlier advertisement called $58.99 a sale price. Gezalyan paid that same $58.99. Upon information and belief, $99.50 was not the Face Object's prevailing regular price when she bought it or during the preceding three months.[19]

47. The advertisement Gezalyan encountered did not state when $99.50 had last prevailed. She bought because she believed she was receiving a substantial, limited-time reduction from a genuine recent regular price.

48. As of November 2, 2026, Pottery Barn's product page listed the same Face Object at "Clearance $38.97" against $99.50. The selling price had fallen again, while the claimed regular price remained $99.50. Upon information and belief, $99.50 is not the Face Object's prevailing regular price.[20]

---

[19] U.S. Patent & Trademark Office, Application Serial No. 99541781, Office Action issued Apr. 21, 2026, PDF pp. 51–52 (screenshot of the Pottery Barn product page dated Apr. 20, 2026, 01:37:03, identifying item 7605437), https://tmng-al.uspto.gov/resting2/api/casedoc/cms/case/99541781/office-action/OfficeAction8451084.pdf (last visited Nov. 5, 2026). Internet Archive, Pottery Barn, Asymmetrical Face Object, captured June 13, 2026, 22:15:21 UTC, https://web.archive.org/web/20260613221521/https://www.potterybarn.com/products/asymmetrical-face-object/.

20 Pottery Barn, Asymmetrical Face Object, White (product page last visited Nov. 2, 2026), https://www.potterybarn.com/products/asymmetrical-face-object/. The advertisement reproduced below was captured Nov. 2, 2026.




Depiction of April 20, 2026 advertisement.




Pottery Barn Face Object advertisement captured November 2, 2026.

***Gezalyan's Bronze Set***

49. Pottery Barn sold Gezalyan one Bronze Sculpted Objects - Set of 2 for $58.97 on September 20, 2026, through potterybarn.com. Before completing the transaction, she viewed the product page's clearance price and higher crossed-out advertised regular price.

50. Before she bought it, the Bronze Set's product page displayed "Clearance" and $58.97 in red beside a crossed-out Advertised Regular Price of $149. Pottery Barn was representing a saving of $90.03, or about 60 percent. The clearance label reinforced the impression of a substantial

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

markdown on remaining merchandise. A true and correct copy of a screenshot showing that offer is below:




*Bronze Sculpted Objects - Set of 2*

51. Gezalyan believed that $149 was Pottery Barn's genuine recent regular price for the Bronze Set and that the advertised reduction to $58.97 represented an exceptional bargain. The size of the represented saving was a substantial factor in her decision to buy.

52. Upon information and belief, $149 was not the Bronze Set's prevailing regular price when Gezalyan purchased it on September 20, 2026, and had not been its prevailing regular price during the preceding three months. Earlier advertisements offered the set for $103.99 against $149 on November 7, 2025, March 7, 2026, and April 20, 2026. By the time Gezalyan bought, the selling price had fallen to $58.97, but the comparison remained $149. Even after her purchase, on September 29, 2026, Pottery Barn again advertised "Clearance $58.97" against $149. The retailer changed its

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

selling price while continuing to measure the supposed bargain against the same higher figure.[21]

53. The benchmark mattered. Compared with $149, the $58.97 purchase appeared to save $90.03. Compared with the earlier documented $103.99 offers, the reduction was $45.02. Pottery Barn's choice of benchmark made the same purchase look like a much larger bargain. On information and belief, its use of the stale or inflated $149 figure overstated the genuine savings.

54. The advertisement did not state when $149 had last prevailed. Gezalyan would not have bought the Bronze Set, or would not have paid $58.97 for it, had she known that the advertised saving relied on a stale or inflated $149 benchmark.

55. On information and belief, the Face Object and the Bronze Set are Pottery Barn's own designs, sold through Pottery Barn's website, catalog, and stores rather than through competing retailers. Pottery Barn's own offers and sales therefore supply the relevant pricing history for evaluating its claimed former prices.

56. On information and belief, these two products are not exceptions. Pottery Barn's advertised regular prices and promotional labels are generated by common merchandising and pricing systems applied across its catalog, and the same pattern—a stale or inflated advertised regular price displayed against a long-standing lower selling price—recurs across Pottery Barn's product lines.

57. Gezalyan received Pottery Barn promotional emails before her purchases. The challenged representations on the product pages were displayed before she submitted her orders. She relied on those price comparisons in deciding that the products offered sufficient value to purchase.

---

[21] Internet Archive, Pottery Barn, Bronze Sculpted Objects - Set of 2, captured Nov. 7, 2025, 17:37:29 UTC, https://web.archive.org/web/20251107173729/https://www.potterybarn.com/products/bronze-sculpted-objects/. Internet Archive, Pottery Barn, Bronze Sculpted Objects - Set of 2, captured Mar. 7, 2026, 17:26:05 UTC, https://web.archive.org/web/20260307172605/https://www.potterybarn.com/products/bronze-sculpted-objects/. Pottery Barn also displayed the Bronze Set at $103.99 against $149 in a capture dated Apr. 20, 2026, 01:37:03, preserved in USPTO Application Serial No. 99541781, OfficeAction8451084, PDF pp. 51–53, https://tmng-al.uspto.gov/resting2/api/casedoc/cms/case/99541781/office-action/OfficeAction8451084.pdf (last visited Nov. 5, 2026). Pottery Barn, Bronze Sculpted Objects - Set of 2, product page last visited Sept. 29, 2026, https://www.potterybarn.com/products/bronze-sculpted-objects/.

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

***Robertson's Ava Ribbon Art Cable***

58. On January 8, 2026, Robertson purchased one Ava Ribbon Art Cable through potterybarnkids.com for $34.99, for personal, family, or household use.

59. Before purchasing the Ava cable, Robertson saw Pottery Barn Kids' product page, which displayed the $34.99 selling price as a sale price beside a crossed-out $59 regular price, and understood $59 to be the cable's genuine regular price. She was shopping for deals and believed that the lower price represented genuine savings. The advertised bargain and promotional urgency caused her to hurry her purchase rather than spend more time comparing alternatives. She relied on those representations and would not have made the purchase otherwise.

60. Upon information and belief, $59 was not the Ava cable's prevailing regular price when Robertson purchased it on January 8, 2026, and had not been its prevailing regular price during the preceding three months. On November 11, 2025, 58 days before she bought it, Pottery Barn Kids advertised the same cable for $34.99 against $59 and identified it as available. Robertson paid that same $34.99 on January 8, 2026.[22]

61. Even after Robertson's purchase, Pottery Barn Kids repeated the $34.99 offer against $59 on March 9 and October 12, 2026. The same lower price thus appeared before her purchase, in her transaction, and in later advertisements. As of November 2, 2026, its product page still displayed "Sale $34.99" against $59. Upon information and belief, $59 is not the Ava cable's prevailing regular price.[23]

***Robertson's LoveShackFancy rolling carts***

62. On August 29, 2026, Robertson purchased two LoveShackFancy Tall Plug-In Rolling Carts in Prairie Wildflower through Pottery Barn Teen for $129.99 each, a total of $259.98. Before

---

[22] Pottery Barn Kids, Ava Ribbon Art Cable, archived Nov. 11, 2025, https://web.archive.org/web/20251111205539/https://www.potterybarnkids.com/products/ava-ribbon-art-cable/ (selling price $34.99, regular price $59, available and on hand).

[23] Pottery Barn Kids, Ava Ribbon Art Cable, archived Mar. 9, 2026, https://web.archive.org/web/20260309033928/https://www.potterybarnkids.com/products/ava-ribbon-art-cable/; current page last visited Oct. 12, 2026, https://www.potterybarnkids.com/products/ava-ribbon-art-cable/. The product page last visited on Nov. 2, 2026 again displayed Sale $34.99 against $59.

buying, she received Pottery Barn Teen's LoveShackFancy email campaign advertising "Up to 50% Off Sale."

63. Robertson saw the rolling carts' higher advertised regular prices beside their lower sale prices before purchasing. She believed those comparisons represented genuine savings from the carts' regular prices. The advertised bargains and promotional urgency caused her to purchase sooner rather than continue comparing alternatives. She relied on those representations and would not have bought the carts otherwise.

64. Upon information and belief, $229 was not the Prairie Wildflower rolling cart's prevailing regular price when Robertson bought on August 29, 2026, or during the preceding three months. Upon information and belief, on June 8, 2026, 82 days before her purchase, the LoveShackFancy Tall Plug-In Rolling Cart was offered for $157.[24]

65. The sale messages continued after Robertson bought her carts. Pottery Barn Teen sent her emails on September 30, October 7, and October 8, 2026 urging her to "Make it yours before it's gone," "Order today!" and "Order today before they're gone!" These messages represented that the sale remained active and that immediate action was necessary to obtain the advertised savings.[25]

66. As of November 2, 2026, Pottery Barn Teen continued to advertise the LoveShackFancy Tall Plug-In Rolling Cart with "Sale on Select Options" against the same $229 advertised regular price. The cart had been promoted on sale months before and after Robertson's purchase.[26]

67. Robertson continues to receive Pottery Barn Teen emails promoting savings and urging her to buy now. She received the same LoveShackFancy sale campaign before her purchase and again in October 2026. The repeated offers and reminders reinforced the appearance of a limited

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

---

24 Kenzie Mastroe, LoveShackFancy X Pottery Barn Teen Just Dropped New Dorm Decor & Some Items Are 40% Off, SheKnows / Yahoo Shopping (June 8, 2026), https://shopping.yahoo.com/home-garden/home-decor/articles/loveshackfancy-x-pottery-barn-teen-170701623.html (last visited Nov. 5, 2026). Other similar items or designs may have been offered at $229.

25 Pottery Barn Teen promotional emails received by Robertson on Sept. 30, Oct. 7, and Oct. 8, 2026 (copies retained by Plaintiff).

26 Pottery Barn Teen, LoveShackFancy Tall Plug-In Rolling Cart (product page last visited Nov. 2, 2026), https://www.pbteen.com/products/loveshackfancy-plug-in-rolling-cart/.

bargain. Upon information and belief, the supposed sale price was the ordinary selling price for the carts she purchased.




Pottery Barn Teen rolling-cart advertisement captured November 2, 2026.




Banner in the October 8, 2026 Pottery Barn Teen email received by Robertson.

**Zizzo's Aubrey corner desk**

68. Pottery Barn sold Zizzo an Aubrey 112-inch Corner Desk with File Cabinets, Dutch White, for $1,707 on November 1, 2024. The order confirmation labels $1,707 a "Limited Time Offer" and shows a crossed-out regular price of $1,897. The comparison represented a $190 saving, approximately 10 percent.



WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017



Zizzo's order confirmation — Aubrey 112-inch Corner Desk, Dutch White.

69. Before purchasing, Zizzo saw Pottery Barn's promotional messages and the desk's "Limited Time Offer" and crossed-out regular price. They caused her to believe that the $1,707 offer was a temporary opportunity to save $190 from a genuine $1,897 regular price. That belief was a substantial factor in her decision to purchase the desk when she did.

70. Upon information and belief, $1,897 was not the desk's prevailing regular price when Zizzo purchased it on November 1, 2024, and had not been its prevailing regular price during the preceding three months. After her purchase, Pottery Barn continued to present the same price as a limited-time bargain. Its August 10, 2025 advertisement offered the same Dutch White desk with file cabinets for $1,707 against $1,897, again labeled "Limited Time Offer."[27]

71. Later advertisements show how Pottery Barn enlarged the apparent saving without lowering the desk's selling price. On January 22, 2026, it offered the same desk for $1,797 against $1,997, an apparent $200 saving. On June 18, it again offered the desk for $1,797, but now crossed out $2,097, an apparent $300 saving. Both offers were labeled "Limited Time Offer." The shopper-facing price stayed the same; the higher benchmark made the bargain look $100 better.[28]

[27] Pottery Barn, Aubrey Corner Desk with File Cabinets, Dutch White, archived Aug. 10, 2025, https://web.archive.org/web/20250810224049/https://www.potterybarn.com/products/aubrey-grand-corner-desk/.

[28] Pottery Barn, Aubrey Corner Desk, archived Jan. 22, 2026, https://web.archive.org/web/20260122173522/https://www.potterybarn.com/products/aubrey-grand-corner-desk/; archived June 18, 2026, https://web.archive.org/web/20260618143425/https://www.potterybarn.com/products/aubrey-grand-corner-desk/.

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

72. On October 8, 2026, nearly two years after Zizzo's purchase, Pottery Barn listed the same Dutch White desk with file cabinets for $1,887 against $2,097 under "Limited Time Offer." As of November 2, 2026, the Dutch White desk with file cabinets still carried the $1,887 price and $2,097 comparison. The advertised figures had changed, but the limited-offer message continued. Upon information and belief, $2,097 is not the Dutch White desk's prevailing regular price.[29]

73. Zizzo believed she had found a limited opportunity to save $190. Yet the same $1,707 offer and $1,897 benchmark appeared again more than nine months later, and later advertisements used higher benchmarks to enlarge the apparent savings. These dated observations support the allegation, on information and belief, that the presentation overstated the temporary and exceptional nature of the offer.

74. Other pieces in the Aubrey collection carry the same recurring comparisons. Pottery Barn offered the Aubrey 18-inch Shelf with File Cabinet in Dutch White at $790 against an Advertised Regular Price of $878 on September 6, 2025, and a September 12, 2025 advertisement displayed the product family under "Limited Time Offer" at $790–$998 against $878–$998. On February 18, 2026, the same shelf was offered at $880 against $978: as with the desk, both numbers moved up together.[30]

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

---

[29] Pottery Barn, Aubrey Corner Desk, last visited Oct. 8, 2026, https://www.potterybarn.com/products/aubrey-grand-corner-desk/ (Dutch White, with file cabinets: selling price $1,887; advertised regular price $2,097). The product page last visited on Nov. 2, 2026 again identified selling price $1,887 against regular price $2,097.

[30] Pottery Barn, Aubrey Storage Shelf with File Cabinet, archived Sept. 6, 2025 and Feb. 18, 2026, https://web.archive.org/web/20250906195848/https://www.potterybarn.com/products/aubrey-single-file-cabinet-bookcase/ and https://web.archive.org/web/20260218034056/https://www.potterybarn.com/products/aubrey-single-file-cabinet-bookcase/. USPTO Application Serial No. 99144336, OfficeAction7803960, Sept. 12, 2025, PDF pp. 32–34, https://tmng-al.uspto.gov/resting2/api/casedoc/cms/case/99144336/office-action/OfficeAction7803960.pdf (last visited Nov. 5, 2026) (reproducing the product-family advertisement).




Depiction of September 12, 2025 advertisement (Aubrey shelves).

75. Pottery Barn advertised the Aubrey 18-inch Narrow Shelf with Cabinet in Dutch White for $808 against $898 on May 13, 2026, and its October 12, 2026 print listing repeated those prices under "Limited Time Offer."[31]

***Melo's West Elm Crinkle Velvet duvet***

76. West Elm sold Melo a Crinkle Velvet Full/Queen Duvet in Pearl Gray for $54.97 on August 16, 2025, through westelm.com. Before he bought, the product page displayed a crossed-out Advertised Regular Price of $189 beside the $54.97 sale price, a represented saving of $134.03, or about 71 percent. The size of that markdown is what led him to buy: he understood $189 to be the duvet's genuine regular price and $54.97 to be a substantial reduction from it, and he relied on that comparison in deciding to purchase online when he did. The $189 price also told him he was getting

[31] Pottery Barn, Aubrey Narrow Shelf with Cabinet, archived May 13, 2026, https://web.archive.org/web/20260513184046/https://www.potterybarn.com/products/aubrey-single-bookcase/; current print listing last visited Oct. 12, 2026, https://www.potterybarn.com/products/aubrey-single-bookcase/pip-print.html.



WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

a higher-quality duvet than $54.97 would ordinarily buy. Had he known that $54.97 was simply the duvet's regular price, he would not have bought it.

77. Before Melo's purchase, on June 24, 2025, a published sale report identified the Crinkle Velvet Duvet Cover in Pearl Gray at a starting price of $54.97 against $189. That was 53 days before he bought.[32]




June 24, 2025 Hip2Save sale report for the Pearl Gray Crinkle Velvet Duvet Cover.

78. After Melo's purchase, West Elm continued to list the Crinkle Velvet Full/Queen Duvet in Pearl Gray at $54.97 against $189 on October 30 and November 2, 2026. The November 2 listing carried sale and final-sale designations. The comparison represented a saving of $134.03, approximately 71 percent.

79. Upon information and belief, $189 was not the duvet's prevailing regular price when Melo purchased it on August 16, 2025, and had not been its prevailing regular price during the preceding three months. The published June offer, the $54.97 price he paid, and the later repetition

32 Hip2Save, West Elm Duvet Covers at Their Lowest Price Ever (June 24, 2025; last visited Nov. 2, 2026), https://hip2save.com/deals/west-elm-duvet-cover/.

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

of $54.97 against $189 support that allegation.[33]

**E. Repeated offers across Pottery Barn's product lines**

80. The same pattern appears in other Pottery Barn merchandise. The following advertisements repeat lower prices against higher benchmarks over months, including the October 12, 2026 observations. Together, they support the allegation that the challenged comparisons are part of a recurring pricing practice, rather than isolated errors.

81. Waffle Weave Blanket. Pottery Barn advertised the product family under "Limited Time Offer," at $59–$109 against $79–$139 on March 3, April 20, and May 4, 2026. On September 30 and October 12, its print listing offered Neutral and Mocha Full/Queen blankets at $99 against $109, and King/Cal King blankets at $109 against $139. Published July 31 and August 31 sale articles also reported the family's entry price of $59 against $79. The articles corroborate continued discounting across the product family.[34]

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

---

33 West Elm, Crinkle Velvet Duvet Cover & Shams, "Crinkle Velvet Full/Queen Duvet, Pearl Gray" (last visited Nov. 2, 2026), https://www.westelm.com/products/cp-stack-crinkle-velvet-duvet-cover-shams-b2259/.

34 Pottery Barn advertisements preserved in USPTO records: Application Serial No. 99625937, OfficeAction8300650, PDF pp. 29, 31 (capture Mar. 3, 2026), https://tmng-al.uspto.gov/resting2/api/casedoc/cms/case/99625937/office-action/OfficeAction8300650.pdf (last visited Nov. 5, 2026); Application Serial No. 99549928, OfficeAction8455649, PDF p. 176 (capture Apr. 20, 2026), https://tmng-al.uspto.gov/resting2/api/casedoc/cms/case/99549928/office-action/OfficeAction8455649.pdf (last visited Nov. 5, 2026); Application Serial No. 99353198, OfficeAction8500022, PDF pp. 56, 59 (capture May 4, 2026), https://tmng-al.uspto.gov/resting2/api/casedoc/cms/case/99353198/office-action/OfficeAction8500022.pdf (last visited Nov. 5, 2026). Pottery Barn, Waffle Weave Blanket, last visited Sept. 30, 2026, https://www.potterybarn.com/products/waffle-blanket/pip-print.html. Southern Living, Pottery Barn summer-sale coverage, July 31, 2026, https://www.southernliving.com/pottery-barn-summer-sale-deals-july-2026-12029023; summer-to-fall bedding coverage, Aug. 31, 2026, https://www.southernliving.com/pottery-barn-summer-to-fall-bedding-august-2026-12066747 (family starting price $59/$79). Current Waffle print listing last visited Oct. 12, 2026.




Waffle Weave Blanket — preserved advertisement.

82. Cline Counter Stool. A March 9, 2026 advertisement showed “Limited Time Offer” prices of $239–$478 against $299–$598. On May 19 and June 17, Pottery Barn advertised the stools in Seadrift, Antique Umber, and Charcoal at $239 against $299 individually and $478 against $598 in pairs. The September 30 and October 12 listings repeat those prices for the same finishes. These observations establish recurring identical advertised reductions over several months.[35]

[35] Pottery Barn search results for stools, captured Mar. 9, 2026, 01:15:32, preserved in USPTO Application Serial No. 98898361, OfficeAction8317377, PDF p. 72, https://tmng-al.uspto.gov/resting2/api/casedoc/cms/case/98898361/office-action/OfficeAction8317377.pdf (last visited Nov. 5, 2026). Pottery Barn, Cline Counter Stool, last visited Sept. 30, 2026, https://www.potterybarn.com/products/cline-counter-stool/pip-print.html. Pottery Barn, Cline Counter Stool, archived May 19, 2026, https://web.archive.org/web/20260519165401/https://www.potterybarn.com/products/cline-counter-stool/; June 17, 2026 capture, https://web.archive.org/web/20260617132444/https://www.potterybarn.com/products/cline-counter-stool/?catalogId=84&sku=9691991&cm_ven=FreePLA&cm_cat=Google&cm_pla=Furniture%20%3E%20Bar%20%26%20Counter%20Stools. Seadrift, Antique Umber, and Charcoal finishes; product page last visited Oct. 12, 2026.

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017




Cline Counter Stool — preserved advertisement.

83. Cloud Quilt. On May 4, 2026, Pottery Barn advertised the family at $139–$209 against $199–$299. Its September 30 and October 12 print listings offered the Chambray Full/Queen quilt at "Limited Time Offer $169" against $249 and King/Cal King at $209 against $299. July 15 and September 21 sale articles reported the Full/Queen quilt at $169 against $249 and described discounts across colors. July 31 and August 31 coverage separately reported the family's entry price of $139 against $199. These dated observations corroborate recurring discounts throughout the summer and into October.[36]

[36] Pottery Barn All Bedding page, captured May 4, 2026, 11:08:32, preserved in USPTO Application Serial No. 99353198, OfficeAction8500022, PDF pp. 56–57 (source URL cited above). Pottery Barn, Cloud Quilt, last visited Sept. 30, 2026, https://www.potterybarn.com/products/cloud-linen-handcrafted-quilt-shams-white/pip-print.html. Apartment Therapy, July 15, 2026, https://www.apartmenttherapy.com/pottery-barn-summer-sale-july-2026-37564377 (last visited Nov. 5, 2026), and Sept. 21, 2026, https://www.apartmenttherapy.com/pottery-barn-bestsellers-sale-september-2026-37691595 (last visited Nov. 5, 2026) (Full/Queen $169/$249); Southern Living July 31 and Aug. 31 articles cited above (family entry price $139/$199). Current Cloud print listing last visited Oct. 12, 2026.



WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017




Cloud Quilt — preserved advertisement.

84. Pick-Stitch Quilt and Sham. Pottery Barn advertised the sham family at $49–$59 against $59–$69 on April 20, 2026, and the quilt family at $159–$259 against $179–$279 on May 4. On June 8, July 10, July 11, and July 18, Pottery Barn advertised the Classic Ivory Full/Queen quilt at $199 against $229 and the White Standard sham as available at $49 against $59. The September 30 and October 12 print listings repeat those prices for the Classic Ivory Full/Queen quilt and White Standard sham under "Limited Time Offer." July 31 and August 31 articles additionally reported the quilt family's entry price of $159 against $179. On information and belief, the July advertisements and repeated later offers reflect sustained discounting, with the higher prices functioning as artificial savings benchmarks rather than genuine prevailing prices.[37]

[37] Pottery Barn Pillowcases & Shams page, captured Apr. 20, 2026, 12:09:03, preserved in USPTO Application Serial No. 99549928, OfficeAction8455649, PDF pp. 147–148; All Bedding page, captured May 4, 2026, preserved in Application Serial No. 99353198, OfficeAction8500022, PDF pp. 56, 58 (source URLs cited above). Pottery Barn, Pick-Stitch Handcrafted Cotton Linen Quilt and Quilted Sham, last visited Sept. 30, 2026, https://www.potterybarn.com/products/6502058/pip-print.html. Pottery Barn, Pick-Stitch quilt and sham, archived June 8, July 10, July 11, and July 18,



WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017




Pick-Stitch Sham — preserved advertisement.

---

2026: https://web.archive.org/web/20260608144553/https://www.potterybarn.com/products/pick-stitch-handcrafted-quilt-white/; https://web.archive.org/web/20260710133435/https://www.potterybarn.com/products/pick-stitch-handcrafted-quilt-white/; https://web.archive.org/web/20260711133522/https://www.potterybarn.com/products/pick-stitch-handcrafted-quilt-white/; https://web.archive.org/web/20260718134305/https://www.potterybarn.com/products/pick-stitch-handcrafted-quilt-white/. Classic Ivory Full/Queen quilt and White Standard sham; print listing last visited Oct. 12, 2026. Southern Living July 31 and Aug. 31 articles cited above provide family-price corroboration.




Pick-Stitch Quilt — preserved advertisement.

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

85. On information and belief, Pottery Barn uses the same pricing systems to repeat these comparisons and limited-offer labels across its merchandise. The dated examples support Plaintiffs' allegation that the challenged comparisons are part of a recurring pricing practice.

**F. The Covered Brands carry the sale-and-urgency message into promotional emails**

86. Defendants also send frequent promotional emails through the Covered Brands. Williams-Sonoma, Inc. reports that it markets to customers using a "proprietary customer file, which is a unified view of customers across our brands and channels, for digital, email and catalog marketing purposes, augmented by models developed by our in-house marketing and data analytics teams." These emails combine large advertised savings with appeals to act quickly, and they link recipients directly to product pages displaying the representations of regular prices challenged here.[38]

87. Pottery Barn's promotional emails combine savings claims with pressure to act. One archived subject line states, "Up to 70% off + On sale & quick-ship! Don't miss out." Another Pottery Barn campaign urged recipients, "Get it before it's gone," alongside a "Limited Time Offer." Pottery Barn also promoted the relevant furniture collection with the subject "ON SALE: The

[38] Williams-Sonoma, Inc., Form 10-K for the fiscal year ended Feb. 1, 2026, Business—Operations (marketing discussion), https://www.sec.gov/Archives/edgar/data/719955/000071995526000059/wsm-20260201.htm (last visited Nov. 5, 2026).

Aubrey Collection." These campaigns carried Pottery Barn's recurring savings and urgency representations directly to shoppers.[39]

88. Gezalyan was on Pottery Barn's email list before her purchases and regularly received promotional emails. Pottery Barn used its email marketing to direct consumers to its merchandise and price comparisons. Gezalyan's purchases followed her review of the product-page representations identified above.

89. Since her purchases, Gezalyan has continued to receive Pottery Barn's promotional emails advertising sale or clearance prices. Pottery Barn continues to use the representations of regular prices and promotional messaging described above to market its merchandise.

90. The representative Pottery Barn Teen email reproduced below combines "UP TO 50% OFF," "this has your name on it," and "Get it before it's gone!" with a "SHOP NOW" button and merchandise labeled "Sale." This representative email shows how Pottery Barn combines large discounts with personalized appeals and urgency to induce immediate purchases.

91. West Elm likewise combines advertised discounts with deadlines urging immediate purchases. Its September 1, 2025 promotional email announced the last day of its Labor Day Sale. The next evening, West Elm announced that the sale had been extended for another day. Its October 14, 2025 email advertised discounts of up to 60 percent ending that night and told recipients, "It's now or never." These campaigns carried the advertised-bargain and urgency messages into consumers' inboxes, and the September sequence shows a sale continuing after the advertised final day.[40]

---

[39] Pottery Barn promotional email, Sept. 2, 2026, as reproduced in the Milled email archive (last visited Sept. 29, 2026), https://milled.com/pottery-barn/up-to-70-off-on-sale-and-quick-ship-dont-miss-out-Rk4K4KKUDtBppjbs. Pottery Barn, "Now on sale! The Faux Black Olive Tree (Plus, up to 60% off just-added deals!)," https://milled.com/pottery-barn/now-on-sale-the-faux-black-olive-tree-plus-up-to-60-off-just-added-deals-WZdrifWZK8hw25qk; "ON SALE: The Aubrey Collection," https://milled.com/pottery-barn/on-sale-the-aubrey-collection-yJQTEHvzgZBFRAzi. These archived campaigns show Pottery Barn's recurring savings and urgency representations.

40 West Elm promotional emails: Sept. 1, 2025, https://milled.com/westelm/last-day-the-labor-day-sale-where-storage-meets-statement-design-abViEcitJTlKgYng; Sept. 2, 2025, https://milled.com/west-elm/extended-one-more-day-to-shop-the-sale-FuYshD_jK65ZITaT; Oct. 14, 2025, https://emaillove.com/email-inspiration-from-west-elm-sale-10 (archives last visited Nov. 2, 2026).



WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

UP TO 50% OFF

Plus, free shipping on 1000s of items* →

*Prices and shipping as marked online

this has your name on it

Get it before it's gone!

SHOP NOW



Floor Standing Ballet Barre



LoveShackFancy Tall Plug-In Rolling Cart with AC Plug & USB A/C (12.75"x35.25")
Sale
$159.99 - $229.00
~~$229.00~~

Representative Pottery Barn Teen promotional email.

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017



West Elm's October 14, 2025 Fall Sale email advertisement.

**G. Materiality, reliance, injury, and the need for equitable relief**

92. Plaintiffs were shopping for deals. Gezalyan relied on the product-page price comparisons for the Face Object and Bronze Set; Robertson relied on the advertised price comparisons for the Ava cable and rolling carts; Zizzo relied on the desk's "Limited Time Offer" and crossed-out Advertised Regular Price; and Melo relied on the duvet's crossed-out $189 Advertised Regular Price beside its $54.97 sale price, a represented discount of about 71 percent. Each understood the higher advertised price as the product's genuine regular price and the lower price as a genuine bargain. The represented savings and urgency caused them to purchase sooner rather than spend more time comparing alternatives. None would have made the challenged purchases otherwise.

93. Plaintiffs lost money as a result. Gezalyan paid $58.99 and $58.97; Robertson paid $34.99 and $259.98; Zizzo paid $1,707; and Melo paid $54.97, each before tax and shipping, for items they would not have bought, or would not have bought at those prices, had Defendants told



WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

the truth about their prices. Defendants received and kept that money. Each Plaintiff's injury is the same kind of injury suffered by every class member who bought an item advertised at a discount from a false or stale Advertised Regular Price.

94. The false comparisons harmed Plaintiffs in several ways. They paid more than they otherwise would have, because the represented savings led them to accept the selling prices as bargain prices. They would not have bought the items at all had they known the selling prices were simply the prices: Melo bought the duvet because he believed he was getting a $189 duvet, and the quality that price implies, for $54.97; Zizzo bought the desk because she believed a $190 saving was about to expire; Gezalyan and Robertson bought because they believed they were getting items that regularly sold for far more. What each of them paid for was the item as Defendants represented it, an item that regularly sold for the Advertised Regular Price. What each received was an item whose prevailing price was the "sale" price. The Face Object was never a $99.50 object, the Bronze Set never a $149 set, the Ava cable never a $59 cable, the rolling cart never a $229 cart, the desk never a $1,897 desk, and the duvet never a $189 duvet: upon information and belief, none of those figures was the item's prevailing price during the three months before the purchase. The difference between the value of each item as Defendants represented it and its actual value is the loss of the bargain each Plaintiff paid for, and it is the same whether that value is measured by what Defendants advertised or by what Plaintiffs understood they were getting. They would have shopped around more: the represented savings gave them a reason to stop comparing, and they could have found similar items for less. And, upon information and belief, they paid more than the items were worth, because the false comparisons inflated the prices Defendants were able to charge.

95. Plaintiffs would like to shop at the Covered Brands again. Gezalyan still receives Pottery Barn's promotional emails, still opens them, and would buy Pottery Barn merchandise, including home décor of the kind she bought here, if she could trust the discounts Pottery Barn advertises. Robertson still receives Pottery Barn Teen's promotional emails and would buy from Pottery Barn Kids and Pottery Barn Teen again. Zizzo would buy from Pottery Barn again, and Melo would buy from West Elm again, if they could trust the discounts those brands advertise. Each of them wants to know the truth about Defendants' prices.

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

96. They cannot. Plaintiffs now know that Defendants' Advertised Regular Prices are not necessarily prices recently charged, but they have no way to tell which ones are real, and it is difficult for any shopper to know whether an advertised sale is genuine. Defendants do not publish an item's complete daily price history, do not state when an Advertised Regular Price was last charged, and do not say how long an item has been "on sale." Gezalyan has looked but could not obtain the complete history needed to determine reliably whether an advertised comparison reflected a genuine recent price. Defendants possess the daily pricing and transaction records needed to make that determination and do not disclose them.

97. A shopper cannot reliably test an advertised temporary offer by waiting for it to expire. If the offer is genuine, waiting may forfeit it; if the offer continues, that observation does not disclose the complete prior pricing history behind the claimed saving. Defendants' undisclosed pricing history leaves Plaintiffs unable to evaluate future advertised bargains reliably.

98. Plaintiffs therefore face an ongoing injury of two kinds. If they buy from the Covered Brands again, they may reasonably but wrongly assume that the Advertised Regular Prices they see are now accurate, and be deceived again. If they do not, they will forgo purchases they would otherwise make because they cannot rely on Defendants' advertising. Either way, the injury continues until Defendants are required to use truthful Advertised Regular Prices or to disclose when their former prices actually prevailed.

99. Plaintiffs lack an adequate legal remedy for the prospective relief they seek. Damages for completed transactions cannot correct Defendants' ongoing advertisements, disclose the undisclosed pricing history needed to evaluate future offers, or prevent the future deception described above. An injunction requiring truthful comparisons and the prescribed former-price disclosures would address that continuing injury. Plaintiffs separately plead restitution in the alternative for purchase money acquired through the challenged practices. The statutory former-price violations do not depend on proving an enforceable contractual promise of savings or the mental-state elements of the common-law claims. If those additional requirements prevent a legal damages award despite proof that Defendants acquired Plaintiffs' money through unlawful or misleading comparisons, restitution would restore the money that the legal claims do not reach. Plaintiffs do not

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

contend that a preference for equitable relief, or the mere availability of alternative pleading, makes an otherwise adequate damages remedy inadequate. They seek no duplicate recovery.

100. Plaintiffs and Class members seek the money they lost as a result, as alleged under each cause of action below, without duplicate recovery. Defendants' own pricing and transaction records show what each Class member paid and the comparison displayed.

## CLASS ACTION ALLEGATIONS

101. Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and, alternatively, (c)(4), on behalf of the following Nationwide Class and California Subclass (together, the "Classes"). The "Class Period" runs from four years before this complaint's filing through class certification:

> **Nationwide Class**: All persons in the United States who, during the Class Period, purchased from Defendants through any of the Covered Brands (Pottery Barn, Pottery Barn Kids, Pottery Barn Teen, and West Elm), online or in a store, one or more items in a transaction in which Defendants presented the item as "Sale," "Clearance," "Limited Time Offer," or otherwise at a discount from a higher stated regular, original, or former price presented as the benchmark for the claimed savings, and who have not received a full refund.
>
> **California Subclass:** All Nationwide Class members who purchased in California, including online purchases delivered to California.

102. Excluded from the Classes are Defendants; their parents, subsidiaries, affiliates, officers, and directors; any entity in which a Defendant has a controlling interest; the judges assigned to this action and their immediate families; and persons who timely and validly opt out. Plaintiffs reserve the right to refine the definition or propose subclasses based on discovery and the Court's rulings. Class membership turns on the purchase, sales channel, advertised comparison, and refund status, not on a determination that Defendants are liable to a particular purchaser; whether the comparisons were false or misleading, and the relief available, remain questions to be adjudicated. Purchasers whose items Defendants' records show were offered at the Advertised Regular Price as the prevailing price during the three months before purchase can be identified from those records

and excluded from recovery, or the Class refined to exclude them, without any individualized inquiry.

103. *Numerosity (Rule 23(a)(1)).* The Classes are so numerous that joinder is impracticable. Pottery Barn generates approximately $3 billion in annual net revenue and advertises substantial amounts of merchandise through regular-price comparisons. On information and belief, the Nationwide Class includes thousands of purchasers and the California Subclass independently includes thousands of purchasers. Common transaction and pricing records permit identification of purchases satisfying the objective class criteria.

104. Commonality (Rule 23(a)(2)). Common questions include how Defendants coordinate pricing and promotions across the Covered Brands; how Defendants select Advertised Regular Prices; the actual offer and sale histories of the affected products; whether the challenged benchmarks genuinely prevailed during the relevant three-month periods; whether advertisements disclosed when those benchmarks prevailed; whether the comparisons and urgency messages are misleading; whether the conduct violates the FAL, UCL, CLRA, and common law; Defendants' knowledge; the application of California law to the Nationwide Class; and the appropriate relief.

105. *Typicality (Rule 23(a)(3)).* Plaintiffs' claims arise from the standardized regular-price and promotional practices alleged here. The challenged transactions concern decorative objects, an art cable, furniture, and bedding, including purchases through the Pottery Barn, Pottery Barn Kids, and West Elm channels. The claims rest on the same legal theories as those of Class members. Differences among products and variants can be addressed through item-level pricing, advertising, and transaction evidence.

106. *Adequacy (Rule 23(a)(4)).* Plaintiffs will fairly and adequately protect the interests of the Classes. They have no interests adverse to the Classes, they understand and accept their responsibilities as class representatives, and they have retained counsel experienced in consumer protection class actions.

107. Predominance (Rule 23(b)(3)). Common questions predominate over any individual questions. The central issues—what Advertised Regular Prices Defendants displayed, what they actually charged and when, and what a reasonable consumer would understand from the

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

comparison—turn on Defendants' own records and standardized advertising, not on individual class members' circumstances. Class membership is determined from those same records. Because the misrepresentations were uniform and material, reliance and causation may be established on a classwide basis. Restitution and damages are susceptible to common proof through pricing, transaction, and valuation evidence, including the difference between the price paid and the price the item would have commanded without the false Advertised Regular Price.

108. Superiority (Rule 23(b)(3)). A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Individual losses are small relative to the cost of litigation, so class members have little incentive or ability to sue on their own; Defendants' records make notice and administration practicable; and a single proceeding avoids inconsistent results.

109. Rule 23(b)(2). Defendants have acted on grounds generally applicable to the Classes through standardized pricing and promotional systems. Final injunctive and declaratory relief requiring truthful price comparisons and promotional representations would address that common conduct and is appropriate for the Classes as a whole. The requested public injunction would also protect future shoppers generally.

110. Rule 23(c)(4). Alternatively, Plaintiffs seek certification of appropriate common issues, including Defendants' methods for selecting Advertised Regular Prices and whether their standardized price comparisons misrepresented genuine recent prices. The Classes are defined by objective transaction, advertising, and product-price characteristics, and the California Subclass adds an objective purchase-location criterion.

111. Application of California law. Plaintiffs seek application of California law to the Nationwide Class because, on information and belief, Defendants developed and directed the challenged pricing and advertising practices from their California headquarters and disseminated the representations from California through the Covered Brands' websites, stores, and email campaigns. The FAL reaches misleading advertising disseminated "from this state before the public in any state." Cal. Bus. & Prof. Code § 17500. Plaintiffs allege that California has a substantial interest in this California-originating conduct and seek nationwide relief under the claims pleaded here. Plaintiffs also seek certification of and relief for the California Subclass. Plaintiffs reserve the right, upon

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

discovery and as permitted by the Court, to seek appropriate additional subclasses and amend the claims and representative allegations.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## Violation of California's False Advertising Law

## Cal. Bus. & Prof. Code §§ 17500 et seq.

**(On behalf of Plaintiffs and the Classes)**

112. Plaintiffs incorporate the preceding paragraphs.

113. The FAL makes it unlawful to make or disseminate, in connection with the sale of goods, any statement concerning those goods that is untrue or misleading and that is known, or by the exercise of reasonable care should be known, to be untrue or misleading. Cal. Bus. & Prof. Code § 17500. Section 17501 further prohibits advertising a former price unless it was the prevailing market price within the three months immediately preceding the advertisement, or the advertisement clearly, exactly, and conspicuously states when the former price prevailed.

114. Defendants disseminated advertising to induce purchases, including the product pages on which Gezalyan relied on July 7, 2026, and on September 20, 2026. Those pages represented that the Face Object normally sold for $99.50 and the Bronze Set for $149, and that the sale and clearance prices were substantial reductions from those regular prices.

115. Those representations were untrue or misleading. Neither $99.50 nor $149 was the prevailing market price of each item during the three months before Gezalyan's purchases, and neither advertisement stated when those prices had prevailed. The advertisements overstated the existence and amount of the discounts and, as to the Face Object, falsely implied that the sale price was a temporary reduction from the regular price.

116. The challenged advertising also includes the desk's $1,707 "Limited Time Offer" beside its crossed-out $1,897 Advertised Regular Price, the Ava cable's $34.99/$59 presentation, the rolling carts' $129.99/$229 presentation, and the duvet's $54.97/$189 presentation described above. Plaintiffs challenge the misleading impression of genuine, limited bargains created by the regular-price comparisons in their promotional context. Upon information and belief, none of those

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

Advertised Regular Prices was the prevailing market price during the three months before the respective purchases, and none of the advertisements stated when it had prevailed. Defendants made and disseminated these comparisons before the public in California and, from California, throughout the United States, through the Covered Brands' websites, stores, and emails.

117. Defendants knew, or by the exercise of reasonable care should have known, that their representations were untrue or misleading, because they set the prices and possessed the price history. The comparisons were likely to deceive a reasonable consumer, and they deceived Plaintiffs. They were material: a reasonable consumer attaches importance to the existence and amount of a price reduction in deciding whether to buy and what to pay. Because the comparisons were uniform in format and content across the Classes, reliance by Class members may be inferred from their materiality.

118. As a direct and proximate result of Defendants' false advertising, Plaintiffs and members of the Classes suffered economic loss when they paid for the products. The false former-price and savings representations induced purchases they would not otherwise have made on the same terms and increased the amounts paid. Defendants received and retained the money paid in those transactions. Under Business and Professions Code section 17535, Plaintiffs and the Classes seek restitution of money Defendants acquired from them by means of the challenged practices, including any price premium attributable to the false comparisons, accounting for the value received. Plaintiffs also seek an injunction, including public injunctive relief, prohibiting Defendants from advertising former prices that were not their prevailing prices within the preceding three months unless Defendants clearly, exactly, and conspicuously disclose when those prices prevailed.

**SECOND CAUSE OF ACTION**

**Violation of California's Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200 et seq.**

**(On behalf of Plaintiffs and the Classes)**

119. Plaintiffs incorporate the preceding paragraphs.

120. The UCL prohibits unlawful, unfair, and fraudulent business acts and practices, as well as unfair, deceptive, untrue, or misleading advertising. Cal. Bus. & Prof. Code § 17200. Defendants

violated each prohibition through the reference-price comparisons, recurring lower-price offers, and promotional presentations described above. Plaintiffs challenge the deceptive comparisons and messages, not Defendants' ability to choose selling prices or advertise genuine bargains.

121. Unlawful business acts and practices. Defendants violated Business and Professions Code section 17500 by disseminating false or misleading representations about their merchandise's regular prices and the savings available. The challenged comparisons include the Face Object's $99.50 benchmark against $58.99; the Bronze Set's $149 benchmark against $58.97; the Ava cable's $59 benchmark against $34.99; the rolling carts' $229 benchmark against $129.99; the Aubrey desk's $1,897 benchmark against its $1,707 "Limited Time Offer"; and the duvet's $189 benchmark against $54.97. The advertisements presented those differences as genuine savings from established prices, rather than comparisons to stale or artificial figures.

122. Defendants also violated Business and Professions Code section 17501. On information and belief, the challenged Advertised Regular Prices were not the prevailing retail market prices for the respective products and variants in the localities of the advertisements during the three months preceding the advertisements identified in Plaintiffs' purchase allegations. Defendants nevertheless used those prices as the basis for their savings claims without clearly, exactly, and conspicuously disclosing when they had prevailed. The item-specific chronology above supplies the factual basis: lower offers appeared before the purchases, and the same comparisons or limited-offer presentations recurred afterward.

123. Defendants violated Civil Code section 1770(a)(13) by making false or misleading factual statements about the existence and amounts of price reductions in consumer transactions. The crossed-out prices, sale and clearance labels, and limited-offer presentations communicated genuine reductions from recent prices. Defendants used those representations to induce the purchases of household goods and resulting economic injury alleged above. Upon information and belief, Defendants also violated Civil Code section 1770(a)(9) by advertising goods at a purported reduction from a regular price with no intention of offering a genuine reduction from a genuine regular price, and section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), as applied through the Federal Trade Commission's Guides Against Deceptive Pricing, 16 C.F.R. § 233.1. Each violation is an

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

independent predicate for liability under the unlawful prong.

124. Defendants knew, or through reasonable care should have known, whether their comparisons were accurate. They chose the advertised benchmarks and selling prices, implemented the promotions, and possessed the product-level pricing and transaction histories. On information and belief, their systems recorded the dates and duration of each price and the amounts customers actually paid. Defendants continued to display the higher benchmarks even as the lower offers recurred.

125. Fraudulent business acts and practices. The challenged presentations are likely to deceive reasonable consumers. A higher regular price beside a lower price and a sale, clearance, or limited-offer label communicates that the lower price provides a real economic advantage measured against an established price. The precise dollar comparisons describe supposed pricing facts, not mere sales puffery. Upon information and belief, Defendants' stale or inflated benchmarks made ordinary or recurring prices appear unusually favorable. Members of the public are likely to be deceived by them, and, because the comparisons were uniform and material, reliance by Class members may be presumed.

126. The comparisons also omitted information needed to understand them truthfully. Having represented the higher figures as a genuine basis for savings, Defendants did not disclose that those figures had not recently prevailed or identify when they had prevailed. Defendants possessed the relevant history and dealt directly with the purchasers as sellers. The partial presentation conveyed the attractive comparison while withholding the pricing facts that would have corrected it.

127. The reliance allegations are transaction-specific. Gezalyan saw and relied on the Face Object and Bronze Set comparisons before placing her July 7 and September 20, 2026 orders. Robertson saw and relied on the Ava cable and rolling-cart price comparisons before her January 8 and August 29, 2026 purchases. Zizzo saw and relied on the desk's $1,707 limited offer against $1,897 before her November 1, 2024 purchase. Melo saw and relied on the duvet's crossed-out $189 Advertised Regular Price beside its $54.97 sale price before his August 16, 2025 purchase. The apparent savings materially influenced their decisions to buy rather than continue shopping or

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

decline the transactions. They would not have made the challenged purchases otherwise.

128. Unfair business acts and practices. Defendants' conduct is contrary to the legislative policies expressed in Business and Professions Code sections 17500 and 17501 and Civil Code section 1770(a)(13). Those statutes protect consumers' ability to evaluate former-price comparisons and claimed price reductions using truthful information. The challenged practice frustrates those policies at the point of purchase by presenting an inflated or stale benchmark as reliable evidence of a bargain. It also conflicts with the policy against fictitious former-price comparisons reflected in the FTC's Guides Against Deceptive Pricing, 16 C.F.R. § 233.1.

129. The practice causes substantial economic injury. The higher benchmark makes the merchandise appear more valuable, and the apparent reduction makes the selling price seem more favorable than truthful information would support. Consumers consequently spend money they otherwise would retain or pay more than they otherwise would agree to pay. The named purchasers' experiences and the recurring product-level comparisons alleged above show how that injury occurs.

130. The harm outweighs any legitimate utility of the challenged practice. Defendants can sell the same furnishings, choose their selling prices, and advertise genuine reductions without using misleading former-price benchmarks. False savings claims do not improve the merchandise or provide a countervailing benefit to consumers or competition. Instead, they distort comparison shopping and reward the seller for creating an appearance of unusual value unsupported by its pricing history. The practice is also immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

131. Consumers could not reasonably avoid the injury. Defendants controlled the historical records needed to test their own price comparisons. A shopper comparing another retailer's current furniture or bedding offer would not learn when Defendants' own claimed former price prevailed. Differences in designs, dimensions, materials, and configurations further impede meaningful comparisons, and Defendants emphasize their proprietary products. The urgency messages described above encouraged shoppers to act before continuing that investigation. General awareness that retailers hold sales does not reveal whether a specific advertised regular price is genuine.

132. Economic injury and relief. Plaintiffs suffered injury in fact and lost money because

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

the challenged practices induced purchases they otherwise would not have made or caused them to pay more than they otherwise would have paid. Defendants received and retained the money paid in those purchases. The false comparisons also increased purchasers' willingness to pay and enabled Defendants to obtain a premium that truthful advertising would not have supported. Plaintiffs and the Classes seek restitution of money acquired from them by means of those practices, including any resulting price premium. The requested restitution accounts for the value received and does not duplicate recovery under the other causes of action.

133. The continuing advertisements also impair Plaintiffs' ability to make future purchases using truthful information. Each Plaintiff wants to shop at the Covered Brands again, and Gezalyan and Robertson continue to receive Defendants' promotional emails, but none of them can determine from the price presentation whether the claimed savings are genuine. An award for a past purchase would not correct that ongoing problem. Prospective relief requiring truthful comparisons and the prescribed former-price disclosures would protect Plaintiffs and the public from future deception.

134. Under Business and Professions Code sections 17203 and 17204, Plaintiffs and the Classes seek restitution of money Defendants acquired through the challenged practices and preliminary and permanent injunctive relief requiring truthful price comparisons and promotional messaging. Plaintiffs also seek public injunctive relief directed to the challenged advertising to consumers generally. Plaintiffs plead legal and equitable claims in the alternative, as alleged above, without seeking duplicate recovery.

**THIRD CAUSE OF ACTION**

**Violation of the Consumers Legal Remedies Act**

**Cal. Civ. Code §§ 1750 et seq. — Injunctive Relief Only**

**(On behalf of Plaintiffs and the Classes)**

135. Plaintiffs incorporate the preceding paragraphs. Plaintiffs assert this claim on behalf of those members of the Classes who purchased goods from Defendants for personal, family, or household purposes, within the limitations period applicable to this claim.

136. Plaintiffs and those class members are "consumers," the Face Object, the Bronze Set, the Ava cable, the LoveShackFancy rolling carts, the Aubrey desk, the Crinkle Velvet duvet, and the

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

other items they purchased are "goods," and their purchases are "transactions," as those terms are defined in Civil Code section 1761. Defendants are "persons" under that section, and they made the challenged representations in transactions intended to result, and that did result, in the sale of goods to consumers.

137. Defendants violated Civil Code section 1770(a)(13) by making false or misleading statements of fact concerning the existence of, and the amounts of, price reductions. On information and belief, Defendants also violated section 1770(a)(9) by advertising goods at a purported discount from a regular price with the intent not to sell them as advertised—that is, with no intention of offering a genuine reduction from a genuine regular price.

138. Defendants' misrepresentations were material to Plaintiffs and would be material to any reasonable consumer. Plaintiffs relied on them, and as a result they spent money on products they would not otherwise have bought or would not have bought at those prices. The resulting harm was an economic loss at the time of purchase: Plaintiffs paid money they would have retained absent the deceptive comparisons, including the portion of each purchase price attributable to the false savings claims. Receiving the products did not undo the loss caused by purchases they otherwise would not have made or by paying more than they otherwise would have paid. Plaintiffs are consumers who suffered damage as a result of Defendants' violations within the meaning of Civil Code section 1780(a).

139. This cause of action seeks injunctive relief only, under Civil Code section 1780(a)(2). Plaintiffs are providing the notice required by Civil Code section 1782 and, if Defendants do not provide the remedies requested within 30 days, will amend this complaint under section 1782(d) to seek actual damages under section 1780(a)(1), including damages for the loss of the represented bargains; restitution under section 1780(a)(3); punitive damages under section 1780(a)(4); and any other relief the Court deems proper under section 1780(a)(5).

140. Plaintiffs and the Classes seek an order enjoining Defendants from advertising inflated or stale former prices, from overstating the existence or amount of price reductions, and from representing that a price is a temporary or clearance reduction from a regular price when it is not. The requested public injunction would protect consumers generally, not merely the parties to this

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

action.

## FOURTH CAUSE OF ACTION

## Intentional Misrepresentation and Fraudulent Concealment

## (On behalf of Plaintiffs and the Classes)

141. Plaintiffs incorporate the preceding paragraphs. Plaintiffs assert this claim on behalf of the Classes within the limitations period applicable to it.

142. Pottery Barn made specific representations of fact to Gezalyan on its potterybarn.com product pages. On July 7, 2026, the Face Object's product page displayed a "Sale" price of $58.99 beside a crossed-out $99.50, representing that $99.50 was the item's regular or former price and that $58.99 was a temporary reduction from it. On September 20, 2026, the Bronze Set's product page displayed a "Clearance" price of $58.97 beside a crossed-out $149, representing that $149 was the item's regular or former price and that $58.97 was a clearance markdown from it. Gezalyan viewed and relied on the product-page price comparisons before completing the respective purchases.

143. Those representations were false. As alleged above, dated advertisements show the Face Object at $58.99 on April 20 and June 13, 2026, before Gezalyan's purchase at that price on July 7. They show the Bronze Set at $103.99 against $149 in November 2025 and March and April 2026, before Gezalyan encountered the $58.97 clearance price against the same $149 comparison. On information and belief, $99.50 and $149 were not the respective products' prevailing market prices during the three months preceding the advertisements Gezalyan encountered. The comparisons overstated the bargains and, as to the Face Object, presented an ordinary selling price as a temporary reduction.

144. Defendants also presented the desk's limited-offer representation and crossed-out Advertised Regular Price described in Zizzo's purchase allegations. On information and belief, Defendants used that presentation to induce immediate purchases by presenting an ordinary or overstated bargain as a limited opportunity.

145. Defendants also made the specific Ava cable and rolling-cart representations described in Robertson's purchase allegations. Before purchasing, Robertson saw the higher advertised prices and lower selling prices, understood the comparisons to represent genuine savings, and relied on

them. The Ava cable's $59 benchmark and $34.99 selling price appeared together in a November 11, 2025 advertisement, 58 days before her January 8, 2026 purchase at $34.99, and the same comparison reappeared afterward. On information and belief, the benchmark did not reflect the item's prevailing market price during the preceding three months. Defendants likewise made the specific duvet representation described in Melo's purchase allegations: a crossed-out $189 Advertised Regular Price beside the $54.97 sale price, which Melo saw and relied on before buying on August 16, 2025. A published sale report had shown the same $54.97 against $189 on June 24, 2025, 53 days earlier, and the same comparison reappeared afterward. On information and belief, $189 did not reflect the duvet's prevailing market price during the preceding three months. Melo understood the comparison to mean he was getting a higher-quality duvet at a deep discount; had he known $54.97 was the duvet's regular price, he would not have bought it.

146. Defendants knew the representations were false when they made them. They set the prices, maintained the daily price and promotion records for the challenged products, and knew how long it had been since each challenged item was actually offered at the crossed-out price. The representations were Defendants' own: their pricing and merchandising personnel at the San Francisco headquarters selected the benchmarks and selling prices and generated the product pages, emails, and store displays. The identities of those individuals are within Defendants' knowledge and not presently known to Plaintiffs.

147. Defendants made the representations intending that consumers, including Plaintiffs, rely on them and buy. Displaying an inflated regular price beside the selling price is intended to make the offer appear more valuable and induce purchases.

148. Defendants' comparisons also constituted misleading half-truths. Once Defendants supplied a purported regular price and the resulting saving, they had a duty to disclose the facts needed to keep that representation from misleading the purchaser, including that the benchmark had not recently prevailed and when it had prevailed. Defendants were the sellers dealing directly with Plaintiffs, possessed their own product-pricing records, and had information about their historical prices that the buyers could not obtain merely by inspecting the merchandise or comparing current offers. The duty arose on three independent grounds: Defendants had exclusive knowledge of

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

material facts, their own pricing history, that were not known or reasonably accessible to Plaintiffs; they made partial representations, the regular price and the saving, that were misleading without the omitted facts; and, upon information and belief, they actively concealed the pricing history by retaining the benchmarks through successive promotions and relabeling the same offers "Sale," "Clearance," and "Limited Time Offer."

149. On information and belief, Defendants knowingly withheld those pricing facts while continuing to display the attractive comparisons, intending that consumers accept the asserted bargains and buy. The omitted history was material because it would have disclosed that the represented savings were not the genuine recent reductions the comparisons conveyed. The purchasers' transaction-specific reliance and resulting economic injuries are alleged above.

150. The fraud alleged here preceded contract formation. Defendants used representations about existing and historical prices to induce consumers to enter the transactions, before they placed their orders or paid. The duty not to misstate those facts or present them through misleading half-truths is independent of any later contractual obligation to deliver the purchased merchandise. Plaintiffs' fraud claim concerns the deception that induced their purchases, not merely a failure to perform a delivery obligation.

151. Plaintiffs actually and justifiably relied on the representations. They had no access to Defendants' internal price history and reasonably took the retailer's own statements about its own prices at face value. Their reliance was a substantial factor in causing them to buy and to lose money. Because the representations were uniform and material, reliance by Class members may be inferred.

152. As a direct and proximate result of Defendants' misrepresentations and concealment, Plaintiffs and members of the Classes entered purchases they otherwise would not have made or paid more than they otherwise would have paid. They were induced to pay for transactions represented to include genuine savings from recent prevailing prices, but did not receive the bargain represented. Plaintiffs and the Classes seek compensatory damages for the losses caused by that deception, measured by the difference between the value of each item as represented and its actual value, under Commercial Code sections 2714 and 2721, or, in the alternative, by the difference between the price paid and the value received under Civil Code section 3343, without duplicate recovery. Defendants'

conduct was fraud within the meaning of Civil Code section 3294. On information and belief, the officers and managing agents who set Defendants' prices and advertised regular prices from their San Francisco headquarters, through the centralized systems described above, authorized or ratified that conduct. Plaintiffs and the Classes therefore also seek punitive damages in an amount sufficient to punish Defendants and deter similar conduct.

**FIFTH CAUSE OF ACTION**

**Negligent Misrepresentation**

**(On behalf of Plaintiffs Gezalyan, Robertson, and Melo and the Classes)**

153. Plaintiffs incorporate the preceding factual allegations. This claim is pleaded in the alternative to intentional misrepresentation and fraudulent concealment, on behalf of Plaintiffs Gezalyan, Robertson, and Melo and the Classes, within the limitations period applicable to this claim.

154. Defendants affirmatively represented existing and historical pricing facts through the Advertised Regular Prices, crossed-out figures, and resulting savings comparisons identified in the purchase allegations. Those factual representations were communicated before the purchasers accepted the offers and paid. They represented that the higher benchmarks were genuine recent prices and that the lower prices afforded real savings. Upon information and belief, those representations were false because the benchmarks were inflated or stale and the comparisons overstated the reductions available.

155. Defendants lacked reasonable grounds for making those representations. They selected the reference prices, selling prices, promotions, and savings calculations and maintained the underlying pricing records. The dated offers alleged above show lower prices recurring alongside retained higher benchmarks. A reasonable review of Defendants' own records before publishing the comparisons would have revealed that the represented former prices and savings lacked the factual basis conveyed to shoppers.

156. Defendants intended consumers to rely on the affirmative comparisons in deciding whether to purchase and how much to pay. They displayed the comparisons as part of the effort to induce the transactions, not merely as statements about how a completed sales contract would be



WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

performed. The duty not to supply false pricing facts without reasonable grounds for believing them true existed independently of the obligation to deliver the goods.

157. The purchasers actually and reasonably relied on the affirmative comparisons, as detailed above. The advertised savings were material and a substantial factor in their decisions to purchase rather than decline, wait, or continue shopping. They reasonably relied on the retailer's statements about its own recent pricing, which was not ascertainable from the goods themselves or from current competing offers. Reliance by Class members may be inferred from the materiality and uniformity of the representations.

158. As a direct and proximate result of their reasonable reliance on Defendants' unsupported statements about existing and historical prices, Plaintiffs and members of the Classes entered purchases they otherwise would not have made or paid more than they otherwise would have paid. Plaintiffs and the Classes seek compensatory damages for the economic loss caused by their reasonable reliance, including their overpayments, under Civil Code section 3343 and, as applicable, Commercial Code sections 2714 and 2721. This relief is sought in the alternative to recovery for intentional fraud, without duplicate recovery.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, request that the Court enter judgment against Defendants as follows:

A. Certifying the Nationwide Class and California Subclass under Rule 23, appointing Plaintiffs as class representatives and their counsel as class counsel, and directing appropriate notice;

B. Declaring that Defendants' practices described in this complaint violate the False Advertising Law, the Unfair Competition Law, and the Consumers Legal Remedies Act and constitute intentional misrepresentation, fraudulent concealment, or, alternatively, negligent misrepresentation;

C. Entering preliminary and permanent injunctive relief, including public injunctive relief, prohibiting Defendants from advertising former or regular prices that were not their prevailing prices within the preceding three months without clearly disclosing

when those prices prevailed, from overstating the existence or amount of any price reduction, and from representing that a price is a temporary or clearance reduction from a regular price when it is not;

D. Awarding restitution under the Unfair Competition Law and the False Advertising Law of the amount by which the prices Plaintiffs and Class members paid exceeded the value they received, including the price premium Defendants obtained through the challenged practice, in an amount to be determined at trial;

E. Awarding compensatory damages on the intentional misrepresentation and fraudulent concealment or alternative negligent misrepresentation claims, including damages for the loss of the represented bargains under Commercial Code sections 2714 and 2721 or, in the alternative, under Civil Code section 3343, in an amount to be determined at trial, without duplicate recovery;

F. Awarding punitive damages on the intentional misrepresentation and fraudulent concealment claim under Civil Code section 3294;

G. Awarding reasonable attorneys' fees, costs, and expenses under Civil Code section 1780(e), Code of Civil Procedure section 1021.5, Federal Rule of Civil Procedure 23(h), the common-fund doctrine, and any other applicable law;

H. Awarding prejudgment and postjudgment interest as permitted by law; and

I. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: November 6, 2026

WILSHIRE LAW FIRM, PLC

By: */s/ Brian J. Ellsworth*
Thiago M. Coelho
Brian J. Ellsworth

Attorneys for Plaintiffs and the Proposed Classes

WILSHIRE LAW FIRM, PLC
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017

## DEMAND FOR JURY TRIAL

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: November 6, 2026

WILSHIRE LAW FIRM, PLC

By: */s/ Brian J. Ellsworth*
Thiago M. Coelho
Brian J. Ellsworth

Attorneys for Plaintiffs and the Proposed Classes

**WILSHIRE LAW FIRM, PLC**
660 S. Figueroa St., Sky Lobby
Los Angeles, CA 90017